IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DANIEL STITT,

              Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

CASE NO. 1:24-cv-1562

DISTRICT JUDGE
SOLOMON OLIVER, JR

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**REPORT &
RECOMMENDATION**

Plaintiff Daniel Stitt filed a Complaint against the Commissioner of
Social Security seeking judicial review of the Commissioner's decision denying
Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§
405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under
Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation.
Following review, and for the reasons stated below, I recommend that the
District Court affirm the Commissioner's decision.

**Procedural history**

In July 2021, Stitt filed an application for Disability Insurance Benefits
alleging a disability onset date of April 16, 2020,[1] and claiming he was disabled
due to alcoholic polyneuropathy and chronic gout in his right wrist. Tr. 273,

---

[1]     "Once a finding of disability is made, the [agency] must determine the
onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x
422, 425 (6th Cir. 2006).

334. The Social Security Administration denied Stitt's application and his motion for reconsideration. Tr. 93, 104. Stitt then requested a hearing before an Administrative Law Judge (ALJ). Tr. 135.

In June 2023, an ALJ held a hearing. Stitt and a vocational expert testified. Tr. 44–75. The next month, the ALJ issued a written decision finding that Stitt was not disabled. Tr. 17–38. The ALJ's decision became final on July 18, 2024, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Stitt filed this action on September 12, 2024. Doc. 1. He asserts the following assignment of error:

> The ALJ's determination is unsupported by substantial evidence as he failed to properly consider the opinion evidence.

Doc. 8, at 3.

### Evidence

*Personal and vocational evidence*

Stitt was born in 1959 and was 60 years old on his alleged disability onset date. Tr. 273. He has a master's degree in business administration. Tr. 51. He used to manage a customer service call center and last worked in April 2020. Tr. 51–52.

*Relevant medical evidence[2]*

In April 2020, Stitt was admitted to the hospital for generalized weakness and a history of alcohol use. Tr. 430–31. His potassium levels were severely low due to a duodenal ulcer and pancreatitis "in the setting of alcohol intake." Tr. 430–31. Stitt appeared confused; a resultant brain MRI showed a three-week-old subdural hematoma. Tr. 431. The doctor suspected nutritional deficiencies, alcohol dementia, and possibly Wernicke's encephalopathy—a severe neurological disorder caused by a vitamin B1 deficiency and evidenced by confusion and a gait abnormality. Tr. 431. Stitt also showed signs of gouty arthropathy. Tr. 431. He was discharged about a month later to a long-term care hospital. Tr. 435–36. At discharge, Stitt was diagnosed in relevant part with acute blood loss anemia; acute, chronic pancreatitis; alcohol abuse; hypertension; aspiration pneumonia; acute and chronic gouty arthropathy; vitamin B12 deficiency; and possible Wernicke-Korsakoff syndrome.[3] Tr. 429, 436. The doctor commented that Stitt had "ambulatory dysfunction" and would need aggressive rehabilitation. Tr. 431.

In August 2020, Stitt saw neurologist Peter A. Cutri, D.O., for a consultation regarding Stitt's subdural hematoma. Tr. 1239. Stitt reported

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Stitt only challenges the ALJ's decision as to his physical issues, so I only recite that evidence.

[3]    Wernicke's encephalopathy is an acute, reversable attack; Korsakoff syndrome may develop later and is generally not reversable. *See Dorland's Illustrated Medical Dictionary* 1824 (33rd ed. 2020).

that in March 2020 he had fallen "for unclear reasons"; could not get back up; and was taken to the hospital. Tr. 1239. Dr. Cutri noted that Stitt's hospitalization "sounds prolonged and complicated dealing with alcohol withdrawal, pancreatitis, c diff, and possible sepsis." Tr. 1239. Stitt spent five to six weeks in the hospital, five to six weeks in a rehab hospital, and returned home the month before his visit with Dr. Cutri. Tr. 1239. Stitt said that he couldn't walk at all before his rehab and that after rehab he could walk "a bit." Tr. 1239. Since then, however, Stitt had "lost ground" and "was not able to walk again." Tr. 1239. He reported arm weakness and paresthesias, which were both worse distally (farther down the arms). Tr. 1240.

On exam, Stitt's arm strength was "4/5 to 3/5 proximal to distal with distal wasting"—meaning he was stronger closer to his body and less so farther from his body. Tr. 1241. Stitt's leg strength was "about a grade weaker." Tr. 1241. Dr. Cutri reviewed an August 2020 nerve conduction study and EMG of Stitt's arms, which showed moderate to severe nerve damage. Tr. 1243. Dr. Cutri diagnosed Stitt with peripheral neuropathy, "very likely a combination of an alcoholic peripheral neuropathy and critical illness." Tr. 1243. He told Stitt that it can take years to recover and that recovery is often incomplete. Tr. 1243. He advised Stitt to abstain from alcohol and to continue to be active and work with physical therapy. Tr. 1243.

In April 2021, a physical therapist discontinued Stitt's physical therapy, which began in August 2020, after 56 visits "due to goal achievement and

4

maximal benefit." Tr. 1264. Treatment included therapeutic exercise and activities, neuromuscular re-education, gait and function training, and education. Tr. 1264. Goals included the ability to ambulate with a rolling walker for up to 300 feet at a time at up to .32 miles per hour. Tr. 1265. At this time Stitt continued with occupational therapy, and this therapist commented that Stitt showed difficulty with right-hand grip strength and improvements in fine motor coordination. T 1267–68. He "continue[d] to be limited with gripping, pinching and twisting." Tr. 1268.

In July 2021, Stitt saw Dr. Cutri for a follow-up. Tr. 1256. Dr. Cutri commented that Stitt was "much stronger today than 6 months ago." Tr. 1256. Stitt could "walk all over the house with just a can[e] all day" but was "[u]nable to make it from [the] parking lot up to office." Tr. 1256. Dr. Cutri's exam showed that Stitt's gait was "effortful and mildly unstable." Tr. 1257. Stitt's arm and leg strength was "5/5 to 4/5 proximal to distal with distal wasting." Tr. 1257.

In September 2021, Stitt saw registered and licensed occupational therapist Lisa Higginbotham for a functional capacity evaluation. Tr. 1907. Higginbotham's exam showed that Stitt's cervical spine range of motion was normal and his lumbar range of motion was impaired. Tr. 1911. Testing of Stitt's lower extremities showed Stitt to be within functional limits for range of motion in all 16 areas tested. Tr. 1911. His strength was rated "4" or "4+" in

five areas (knees and "ankle plantar") and "3+" in "hip flexion."[4] Tr. 1911. Testing of his upper extremities showed that Stitt was within functional limits for range of motion in all 17 areas tested. Tr. 1912. He had "4" to "4+" strength in six areas. Tr. 1912. Stitt's "right hand gross grasp" was "approximately 75 [percent] of normal flexion … due to polyneuropathy and weakness." Tr 1912. Stitt reported numbness in his legs but his "gross light touch" sensation was "intact." Tr. 1912. He reported using a straight cane in the house and he used a wheeled walker during the exam. Tr. 1912. Stitt's hand sensation was "impaired overall … due to polyneuropathy." Tr. 1912.

Based on hand testing, Higginbotham opined that Stitt could perform "simple grasping" frequently and "firm grasping" and "pinching" occasionally. Tr. 1913. He needed to avoid fine and gross motor coordination. Tr. 1914. During the walking test, Stitt walked at a slow pace with his walker. Tr. 1914. His stride pattern was uneven and he had an antalgic gait;[5] Higginbotham found that Stitt needed to avoid walking. Tr. 1914. She found that Stitt could occasionally reach forward but must not reach overhead. Tr. 1914. He must

---

[4]    Higginbotham's range of motion and strength chart left blank many spaces in the strength column. Tr. 1911–12. It's not clear what, if any, meaning a blank space carries. The ALJ concluded that this meant that Stitt's strength testing was unremarkable, Tr. 33, a characterization that is reasonable and which Stitt does not contest.

[5]    An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, at 96 (33rd ed. 2020).

avoid bending, squatting, kneeling, balancing, crawling, squatting, pushing, pulling, and climbing stairs. Tr. 1914–15; *see also* Tr. 1908.

Finally, Higginbotham's testing showed that during the exam Stitt sat for a total of 2 hours and 15 minutes, and stood for a total of 16 minutes for 6 minutes at a time "before requiring a change of position." Tr. 1915. Based on this testing, Higginbotham opined that in a workday Stitt could sit for up to 8 hours and 27 minutes, and stand for up to 1 hour and 56 minutes for 15 minutes at a time "before requesting a change of position." Tr. 1915; *see also* Tr. 1908. Higginbotham reported that Stitt demonstrated consistent effort throughout the exam and had a reliable pain rating. Tr. 1907. She opined that Stitt was "presently unable to work full time while taking into account his need to alternate siting and standing as noted in this report." Tr. 1907. She also wrote that Stitt was "presently restricted from work due to impaired safety with balance and ambulation as well as impaired gross and fine motor coordination." Tr. 1908. Higginbotham stated that the "unskilled sedentary occupational base is significantly eroded because [Stitt] is unable to walk occasionally, and stand for 1 hour and 45 minutes."[6] Tr. 1907.

About a year later, Stitt's doctor, Kamal Khalafi, M.D., signed a medical source statement in which he referenced Higginbotham's functional capacity exam and stated that Stitt was disabled. Tr. 1904.

---

[6]     Higginbotham's report is inconsistent as to how long Stitt can stand. *See* Tr. 1907–08 (stating that Stitt can stand for one hour and 45 minutes and on the next page stating that Stitt can stand for one hour and 56 minutes).

*State agency opinions*[7]

In September 2021, Rohini Mendonca, M.D., reviewed Stitt's record and accessed Stitt's residual functional capacity (RFC).[8] Tr. 99–101. Dr. Mendonca opined that in a workday, Stitt could frequently lift, carry, push, and pull 10 pounds; stand and walk for two hours; and sit for six hours. Tr. 99. He could frequently handle, finger, and feel with his hands. Tr. 100. Stitt could frequently balance and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. Tr. 99. He could never climb ladders, ropes, or scaffolds. Tr. 99. He must avoid concentrated exposure to extreme cold, heat, and vibration, and all exposure to hazards. Tr. 100.

In February 2022, Elizabeth Das, M.D., reviewed Stitt's record and agreed with Dr. Mendonca's opinion. Tr. 109–11.

---

[7]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[8]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

*Hearing testimony*

Stitt, who was represented by counsel, testified by video at the administrative hearing held in June 2023.[9] When asked why he couldn't work, Stitt answered that he wouldn't be able to "manage and keep up with the written and typing communications" of his past job because he can't efficiently use his hands. Tr. 57. Stitt explained that at work he had to promptly respond to emails and phone calls throughout the day. Tr. 60. And while he walks comfortably around his house with a cane, walking around unknown areas is "extremely difficult" and he quickly fatigues while standing. Tr. 57. He uses a walker to walk anywhere outside his home and a wheelchair when traveling long distances. Tr. 57.

When asked how he spends his time, Stitt said that it takes him an "hour and a half just to get up and loosen up, … make sure [his] extremities are moving." Tr. 58. He tries to do his physical therapy exercises and "stretch those boundaries" of getting up, down, and moving around the house. Tr. 58. Stitt reads and communicates with people on the internet. Tr. 58. He folds clothes and can wash some dishes. Tr. 58. Stitt can perform personal care and grooming, although he can't shave or arrange his hair. Tr. 59. He has begun to trim his mustache; previously his wife did this for him. Tr. 59.

---

[9]    Stitt had an administrative hearing in February 2023 with a different ALJ. Tr. 76. Stitt's case was then re-assigned to the current ALJ, who held a hearing in June 2023. Tr. 46.

Stitt explained that he can grab bigger items, like a can or the handle of his cane, but has problems with "something delicate like an egg or … a knife." Tr. 60. He estimated that he could walk with a cane for about 20 yards in his house before needing to sit down because his legs get weak. Tr. 62. Stitt can stand in one place using a cane for about five minutes before having to sit down. Tr. 63. If he sits for longer than an hour, it's hard for him to loosen up and stretch. Tr. 63–64. Gabapentin helps control the pain and tingling in his feet and hands. Tr. 64.

The ALJ discussed with the vocational expert Stitt's past relevant work as a customer service manager. Tr. 68–69. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Stitt could perform Stitt's past work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 69. The vocational expert answered that such an individual could perform Stitt's past work as the Dictionary of Occupational Titles defined it. Tr. 69. The ALJ asked how much off-task time an employer would tolerate, and the vocational expert replied that 20 percent or more off-task time would be work preclusive. Tr. 71.

Next, Stitt's attorney asked the vocational expert if her answer would change if the hypothetical individual was limited to occasional, rather than frequent, handling, fingering, and feeling. Tr. 71. The vocational expert stated that such an individual could not perform Stitt's past work. Tr. 71-72. Stitt's

attorney then told the ALJ that the ALJ's "off-task questions would have addressed [his] other concerns" and had no further questions. Tr. 72.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.
>
> 2.  The claimant has not engaged in substantial gainful activity since April 16, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> 3.  The claimant has the following severe impairments: vascular insult to brain; arthritis; peripheral neuropathy; gout; hypertension; and obesity (20 CFR 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except frequent push or pull with the bilateral upper and lower extremities; frequent handling, fingering, or feeling, bilaterally; occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; can never work at unprotected heights, with dangerous moving machinery, or commercial driving; no more than frequent exposure to extreme cold, heat, or vibration; and requires a cane for ambulation.
>
> 6.  The claimant is capable of performing past relevant work as a manager, customer service

11

(168.167-058, SVP 8, sedentary, and performed light). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity, as the job is performed generally (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from April 16, 2020, through the date of this decision (20 CFR 404.1520(f)).

Tr. 19–37.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.    Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.    Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.    Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is

disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains

13

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Stitt argues that the ALJ failed to properly consider Higginbotham's opinion. Doc. 8 at 14–19.

14

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. *Id*. at § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. *Id*. at § 416.920c(b)(2). "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). "Consistency" means "[t]he more consistent a medical opinion[ ] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[ ] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner is not required to discuss the remaining factors. *Id*. And "an ALJ need not specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

To recap, the ALJ's RFC limited Stitt to:

> sedentary work as defined in 20 CFR 404.1567(a)[10] except frequent push or pull with the bilateral upper and lower extremities; frequent handling, fingering, or feeling, bilaterally; occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; can never work at unprotected heights, with dangerous moving machinery, or commercial driving; no more than frequent exposure to extreme cold, heat, or vibration; and requires a cane for ambulation.

Tr. 26. The ALJ recited Higginbotham's findings and her and Dr. Khalafi's opinions[11] as follows:

> The functional capacity evaluation dated September 16, 2021 (by Lisa Higginbotham, OTR/L), indicates that the claimant provided consistent and reliable effort 100% of the time (10F/5); he is restricted from work due to impaired safety with balance and ambulation, as well as impaired gross and fine motor ambulation (10F/6). The evaluation concluded that the claimant is capable of sedentary exertion on a

---

[10]    20 C.F.R. § 404.1567(a) defines sedentary work as:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id*. Walking or standing "occasionally" generally means "no more than about 2 hours of an 8-hour workday." *See* Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

[11]    Because Dr. Khalafi adopted Higginbotham's functional report as his own, Tr. 1904–06, the ALJ considered both providers as having authored the opinion, Tr. 33.

full-time basis, but must "avoid" walking, above shoulder reaching, postural activities, climbing, and fine/gross coordination; he can perform occasional reaching, firm grasping, and pinching; and he can perform frequent simple grasping (10F/15). The specific findings from the evaluation include that he had some reduced strength with shoulder flexion, elbow flexion, supination, pronation, wrist flexion and wrist extension bilaterally; however, he was within functional limitations as to active range of motion and he was unremarkable as to the other areas of strength (10F/10). The portion of Dr. Khalafi and Ms. Higginbotham's opinions noting that the claimant is disabled and unable to return to work, are not persuasive because those issues are reserved to the Commissioner. The portions of their opinions noting that the claimant is limited to sedentary exertion are persuasive because they are consistent with the complete record, including the persuasive opinions of the state agency medical consultants and the more complete record. The portions of their opinions noting that the claimant must "avoid" walking, above shoulder reaching, postural activities, climbing, and fine/gross coordination; he can perform occasional reaching, firm grasping, and pinching; and he can perform frequent simple grasping, are not entirely consistent with the record. While the record supports some degree of limitations, it is not entirely consistent with the relatively extreme degree of limitations they noted.

Tr. 33. The ALJ spent almost the entire next page summarizing the record evidence and explaining why that evidence supported his findings. Tr. 33–34.

Stitt complains that the ALJ failed to consider all of Higginbotham's assessed limitations and identifies Higginbotham's purported "sit/stand limitation" as one that the ALJ failed to mention. Doc. 8 at 16–18 (citing Tr. 1915); Doc. 11, at 3–4. He asserts that when a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include

17

such a limitation in the RFC. Doc. 8, at 17; *see, e.g.*, Soc. Sec. Ruling 96-8P, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (S.S.A. July 2, 1996); *Davidson v. Comm'r of Soc. Sec.*, No. 3:16-cv-2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018). The Commissioner contends that the ALJ considered Higginbotham's alternate-sitting-and-standing limitation and that, in any event, Stitt hasn't shown that Higginbotham's sit-stand limitation conflicts with the ALJ's RFC. Doc. 10, at 5–6.

Higginbotham found that in a workday Stitt could sit for 8 hours and 27 minutes total and for 1 hour and 32 minutes at a time, and stand for 1 hour and 56 minutes total for 15 minutes at a time. Tr. 1908. In one section of her report she opined that Stitt "is presently unable to work full time while taking into account his need to alternate sitting and standing as noted in this report," Tr. 1907, and in another section she opined that Stitt "is presently restricted from work due to impaired safety with balance and ambulation as well as impaired gross and fine motor coordination," Tr. 1908; *See also* Tr. 1906 (Dr. Khalafi referencing Higginbotham's functional exam and stating "Pt. is disabled."). The ALJ found that these opinions regarding Stitt's disability status and inability to work were not persuasive because these issues are reserved to the Commissioner. Tr. 33; *see* 28 U.S.C § 404.1520b(c)(3)(i),(vi) (defining "[e]vidence that is inherently neither valuable nor persuasive" as "[s]tatements on issues reserved to the Commissioner," including "whether [a

18

claimant] [is] or [is] not disabled, … able to work, or able to perform regular or continuing work," and "whether or not [his] residual functional capacity prevents [him] from doing past relevant work."). So the ALJ sufficiently explained why he rejected Higginbotham's opinion, which Higginbotham based on Stitt's need to alternate sitting and standing.

To the extent that Stitt argues the ALJ should have separately explained why he rejected Higginbotham's findings that Stitt can sit for almost 8.5 hours total and 1.5 hours at a time and stand for almost 2 hours total and 15 minutes at a time, which, he says, amounts to a requirement that Stitt must alternate positions, Doc. 8, at 16–17 (citing Tr. 1915), his argument fails. Stitt hasn't explained how these findings amount to an "alternate positions" limitation, or that, even if it could be so construed, it conflicts with the RFC limiting him to sedentary work. So he hasn't shown that the ALJ was required to separately explain why he didn't include an "alternate positions" limitation in his RFC.

In any event, the ALJ found that Stitt could perform his past work as a customer service manager,[12] Tr. 37, which is "highly skilled," Tr. 68. While "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will," this is not the case with skilled jobs like Stitt's.

---

[12]    Stitt's past work is sedentary, which "invo[l]ves sitting most of the time, but may involve walking or standing *for brief periods of time*." *See* Dictionary of Occupational Titles, Fourth Edition, Revised 1991, DOT 168.167-058, *Manager, Customer Service*, 1991 WL 647371 (emphasis added).

*See, e.g.,* Soc. Sec. Ruling 83-12, *Capability to do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*, 1983 WL 31253, at *4 (S.S.A. 1983) (as to "alternate sitting and standing," "[t]here are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, … he or she would not be found disabled.").[13] And at step four, the burden is on Stitt to show that he cannot perform his past work. *See Jordan*, 548 F.3d at 423. Stitt has failed to do so here.

Stitt complains that "[t]he VE did not testify how the reduction i[n] standing time or need to change positions affected Mr. Stitt's ability to perform his past relevant work." Doc. 8 at 19. This is true. But Stitt's counsel didn't ask the vocational expert any questions about the need to change positions. In fact, at the administrative hearing Stitt's counsel argued only that Stitt was unable to perform his past work due to his hand limitations, which he characterized as "just an off-task-type of absentee issue." Tr. 49. He did not claim that Stitt couldn't perform his past work because of a purported need-to-alternate-positions limitation. So any lack of vocational expert testimony on this issue is attributable to Stitt, not the ALJ. Simply put, the ALJ was not on notice that

---

[13]    Notably, Higginbotham commented that "the unskilled sedentary occupational base is significantly eroded" due to Stitt's walking and standing limitations. Tr. 1907. But Stitt's past work was skilled, not unskilled.

20

Stitt purportedly believed that there was an issue regarding a sit-stand option, and, as explained above, Higginbotham's findings don't obviously conflict with the ALJ's RFC.[14] *See Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) ("It is axiomatic that 'a court should not consider an argument that has not been raised in the agency proceeding that preceded the appeal.'") (citation omitted); *see also Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023).

Next, Stitt argues that the ALJ's reasons for rejecting Higginbotham's opinion about Stitt's hand limitations were insufficient. Doc. 8 at 18. He observes that in support of his finding that Stitt had limitations using his hands and fingers, the ALJ relied on the August 2020 nerve conduction and EMG findings showing that Stitt had "moderate to severe active sensorimotor axonal peripheral polyneuropathy with secondary demyelination." *Id*. (quoting Tr. 33). Stitt writes: "[h]owever, included with the EMG is a notation that Mr. Stitt's peripheral neuropathy was a combination of an alcoholic peripheral neuropathy and critical illness peripheral neuropathy" and that this "can take[] years to recover from and recovery is often incomplete." *Id*. Stitt asserts that this shows that the ALJ "succumbed to the temptation to 'play doctor,'" which is grounds for finding that the ALJ's decision is unsupported by

---

[14]    As for a "reduction in standing time," the ALJ's RFC found that Stitt could perform sedentary work, Tr. 26—stand or walk no more than two hours— and Higginbotham stated that Stitt could stand for one hour and 56 minutes total, Tr. 1908, which amounts to a technical 4-minute "reduction" of standing time in an 8-hour workday. Stitt's attorney did not ask the vocational expert about this either and Stitt does not explain here how this "reduction in standing time" warrants remand.

substantial evidence. *Id*. But earlier in the decision, the ALJ acknowledged that Stitt's neurologist thought that Stitt's limitations "were likely due to a combination of alcoholic peripheral neuropathy and critical illness peripheral neuropathy." Tr. 29. And the ALJ recognized that the record showed that Stitt "has experienced irreversible complications from alcohol use, including peripheral neuropathy." Tr. 20. So the ALJ did not ignore this evidence, if that is what Stitt is arguing, and the ALJ was not required to repeat these observations a second time.

Meanwhile, the ALJ explained that while Higginbotham opined that Stitt had limitations using his arms and hands and that her exam findings showed that Stitt "had some reduced strength" in those areas, her exam also showed that Stitt "was within functional limitations as to active range of motion and he was unremarkable as to the other areas of strength." Tr. 33; *see also* Tr. 1912 (Higginbotham's findings showing that Stitt's "upper extremity range of motion" was within functional limits in all 17 areas tested and that Stitt had slightly reduced (4 or 4+ out of 5) strength in only six of those areas). In other words, the ALJ adequately explained that Higginbotham's assessed limitations were not supported by her exam findings. The ALJ also commented that Stitt's coordination was deemed to be normal at exams in April and August 2021 and April 2022, which the ALJ found to be "not entirely consistent" with Higginbotham's stricter limitations. Tr. 34.

All told, Stitt has not shown that the ALJ's evaluation of Higginbotham's opinion was insufficient.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 28, 2025

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).